2025 IL App (1st) 250009-U

No. 1-25-0009

Order filed December 31, 2025

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| *In re* ESTATE OF CHARLISE SMITH, Deceased | ) | Appeal from the |
| | ) | Circuit Court of |
| (The Illinois Department of Healthcare and Family Services, | ) | Cook County. |
| | ) | |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 19 P 5510 |
| Quenita Smith, Estate Administrator, | ) | |
| | ) | Honorable |
| Respondent-Appellant). | ) | James Patrick Murphy, |
| | ) | Judge, presiding. |

_____

JUSTICE LAMPKIN delivered the judgment of the court.
Justices Rochford and Reyes concurred in the judgment.

## ORDER

¶ 1    *Held*:  The circuit court's judgment that the Department asserted valid claims against the Estate seeking recovery of the funds the Department expended for decedent's care for the final 27 years of her life was not against the manifest weight of the evidence. Moreover, equitable estoppel did not apply to bar the Department from pursuing those claims against the Estate.

¶ 2    Decedent Charlise Smith was a recipient of medical assistance through the Medicaid program, and the Estate of Charlise Smith (Estate) obtained recovery for decedent's tortious injury in a personal injury lawsuit. The Illinois Department of Healthcare and Family Services (Department) settled with the Estate the Department's lien for medical assistance that was related to decedent's tortious injury. Thereafter, the Department filed two claims against the Estate for medical assistance that was not related to decedent's tortious injury but, rather, was for the medical assistance she had received for the final 27 years of her life. The Estate invoked common law defenses to those claims, arguing that the Department had settled them when it settled its lien. After a bench trial, the circuit court issued judgment for the Department.

¶ 3    On appeal, the Estate argues that the circuit court erred because (1) the Department's settlement of its lien barred the Department's subsequent claims, and (2) equity and due process considerations should have estopped the Department from pursuing those claims.

¶ 4    For the reasons that follow, we affirm the judgment of the circuit court.[1]

¶ 5                                    I. BACKGROUND

¶ 6    Decedent was an 82-year-old public aid recipient. The Department paid her medical expenses from October 17, 1992, until her death on June 12, 2019. In total, decedent received $1,066,067.22 in medical benefits from the Department during her lifetime that were unrelated to any tortious injuries.

¶ 7    In early May 2019, decedent was traveling to a dialysis appointment in a Medi-car when she fell from her wheelchair and fractured both femurs. The Department continued to pay for her

_____

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

medical care, including those expenses resulting from her injury. She later died from complications related to that injury.

¶ 8 In September 2019, decedent's attorney, Salvatore Indomenico, opened an estate in decedent's name, with decedent's daughter Quenita Smith appointed as administrator. The Estate subsequently filed a personal injury/wrongful death action against Daleco Transport, Inc. (Daleco), and its owner. Indomenico contacted the Department in September 2019, seeking to know whether the Department intended to assert a lien in the personal injury cause of action. Indomenico testified at the bench trial that he was familiar with liens and understood the importance of resolving them before settling a case. Eventually, he was put in touch with Frank Gorg, who was a recovery consultant in the personal injury unit of the Department. Indomenico and Gorg had negotiated approximately a dozen liens on personal injury causes of action over the years. Quenita, the Administrator, executed a request to the Department seeking any and all "medical bills/liens from 5/4/2019 to present."

¶ 9 With respect to decedent's Medicaid identification number, Gorg initially found no Medicaid payments made on her behalf for the personal injury, testifying that it was typical for there to be a delay between the time payments occur and when they show up in the account. Subsequently, Gorg found and forwarded to Indomenico copies of the Department's ledgers containing the amounts it spent on decedent's medical care related to her tortious injury. Gorg also sent Indomenico a notice of lien against the personal injury cause of action, explaining that the amount had yet to be determined. The lien sought to recover the amount of Medicaid funds the Department provided for the treatment of decedent's injuries.

¶ 10    Thereafter, Indomenico advised the Department that the personal injury cause of action had settled for $500,000 in February 2020. Indomenico asked Gorg to let him know "what the State is looking for." In July 2020, Indomenico contacted Gorg again, advising him that the lien amount was $37,107.57 and asking if Gorg was willing to negotiate over the telephone. Indomenico and Gorg negotiated and, in August 2020, Gorg wrote to Indomenico to confirm that the Department's lien was $37,914.88. Gorg wrote that the Department would "accept $20,000.00 in settlement for the injuries related to the accident of May 4, 2019."

¶ 11    In September 2020, the Estate filed petitions in the circuit court's law and probate divisions to settle the tort action against Daleco for $500,000. The Estate also filed a petition in the probate division to waive bond on the settlement proceeds, but the court denied that petition because the Estate had never published notice for any potential claims against it. The court continued the matter and ordered the Estate to inform the court if any claims were filed once the six-month application period for the filing of any claims had expired.

¶ 12    The first $20,000 check that Indomenico sent to the Department in October 2020 did not bear a signature. The personal injury unit of the Department returned the check, requesting that Indomenico re-issue it and adjust the wording of the accompanying letter. Indomenico's replacement letter stated "$20,000 as reimbursement for a personal injury case with a date of injury of May 4, 2019 for a lien covering public assistance from the dates of 5/4/2019 until 6/13/2019."

¶ 13    Meanwhile, the Estate caused notice of decedent's death to be published in the Chicago Daily Law Bulletin so that creditors could file claims. The notice gave creditors until March 28, 2021, to file any claims against the Estate. In response, the Department filed a fourth class claim and a sixth class claim in the probate action on March 26, 2021, consisting of medical payments

made on decedent's behalf from October 1992 until the last of the bills was paid after her death for treatments that were unrelated to her injury. The fourth class claim reflected reasonable and necessary medical, hospital, and nursing home expenses for decedent's care during the year immediately preceding her death, while the sixth class claim reflected Medicaid expenses made from 1992 until June 11, 2018, a year and a day prior to her demise.

¶ 14    In July 2021, the Estate moved to dismiss the Department's claims, and the circuit court denied that motion. Discovery proceeded and both parties filed motions for summary judgment. Among other assertions, the Estate asserted that the Department attended the October 27, 2020, hearing at which the court approved the settlement but failed to alert the Estate or the court that it had additional claims and failed also to object to the settlement. The Estate even averred that "Counsel for the Department attended the hearing on October 27, 2020 and requested that certain changes be made to the order." At his deposition and at trial, Indomenico admitted that the hearing may have been via Zoom, rather than in person, and did not recall the circumstances of the Department's alleged attendance. He also admitted that it was the court that "had issues with the numbers" he had supplied on the order, with the judge crossing some out and recalculating others. The Department averred that it had no record of anyone attending that hearing on its behalf. Nor do the docket sheets mention the Department's attendance. The court later explained that the Estate's proposed distributions in the draft order contained incorrect information and failed to account for the requirement that the settlement proceeds enter the Estate after the lien satisfaction so that creditors and claimants could be paid from it.

¶ 15    The circuit court denied the motions for summary judgment. The case proceeded to trial in mid-October 2024.

¶ 16    The Department certified that the records attached to its claim were legal records of the payments that it had made on decedent's behalf. Those records listed decedent's medical expenses that the Department paid from 1992 through her death in 2019, including home health care, medical provider, transportation, and other expenses, along with medical bills that were submitted and paid after she died. After submitting the records into evidence, the Department rested.

¶ 17    The Estate called Gorg as its first witness. Gorg, who had retired, testified that he spent 30 years negotiating hundreds, and possibly thousands, of personal injury settlements on behalf of the Department. He had known Indomenico for about 15 to 20 years from negotiating about a dozen personal injury settlements with him. Gorg lacked any independent memory of decedent's case and of his negotiations with Indomenico. He testified that it was not his practice to inform the attorneys with whom he negotiated that there might be other divisions of the Department seeking recoupment of funds. He was unaware that the Department planned to file a probate claim regarding decedent's medical care, and explained that he had never settled a matter with Indomenico that included both personal injury liens and probate claims.

¶ 18    Indomenico testified that he, too, lacked an independent recollection of his conversations with Gorg, but he knew that they had occurred. He identified e-mails between himself and Gorg relating to the documentation of medical expenses and the negotiations. He also identified the spreadsheet of medical charges for decedent related to the accident, which spreadsheet Gorg had forwarded to him as a password-protected copy for his review. Indomenico's practice was always to review the spreadsheets because occasionally he would find a charge unrelated to the client's injury or accident and then Gorg would make the appropriate adjustment.

¶ 19    According to Indomenico, every time in the past that he negotiated a lien with Gorg, he would get "a number and then the case would be over." He reviewed his affidavit stating that it was his "understanding that the settlement *** represented a settlement of any and all claims or liens that could have been asserted by [the Department] against any of the proceeds from the [personal injury] settlement" and adopted that statement as his trial testimony. Had he known the Department would assert additional claims after the personal injury settlement was finalized, he would have moved to adjudicate them prior to entering the settlement agreement. He also explained that he settled the personal injury case with Daleco for the insurance policy limits.

¶ 20    Indomenico acknowledged that he was a personal injury attorney who did not specialize in probate. He typically would open the estate without charging the client, especially if there was a minor or disabled person involved. He admitted that "occasionally" he mistakenly failed to publish notice for creditors and claimants, so he no longer opens estates; probate law was not his "wheelhouse." He was unfamiliar with the statutory requirements of notice to creditors but insisted that "[the Department] had notice" of decedent's death, which he characterized as "actual notice," meaning that he "didn't need to publish as to Public Aid." He explained that the Department had notice because that was "how [Gorg] was involved," so Indomenico had no need to either publish notice or give the Department actual written notice as a known creditor pursuant to section 18-3 of the Probate Act of 1975 (Probate Act) (755 ILCS 5/18-3 (West 2024)).

¶ 21    Indomenico testified that in early 2021, he contacted Gorg, who had retired, in an attempt to clarify what had occurred during their negotiations over decedent's personal injury settlement. Indomenico drafted a proposed affidavit for Gorg to sign, but Gorg refused. Indomenico recounted that Gorg said he was not comfortable signing such a statement because "his wife, I believe,

continued to work for the department, that he didn't want anything to affect her employment because she had a few more years there." Gorg later testified that his wife worked for the River Trails School District and had never worked for the State of Illinois.

¶ 22    Indomenico noted that not only was he unaware of other claims, but he "would have expected [Gorg] to let me know that there's more coming." Indomenico added, "I'm telling you we never had anything like this happen."

¶ 23    Gorg, recalled as a witness, explained that he did not recall whether he told Indomenico that the $20,000 settlement they negotiated was "only for a personal injury lien," but Gorg believed "it's always been understood that's the case." He stated that Indomenico asked him to telephone Matthew Hess, the other attorney for the Estate, as well as sign the affidavit, but Gorg did not feel comfortable doing that, either. He explained that he was no longer a Department employee, probate was not his area of expertise, and policies could have changed since his retirement.

¶ 24    Gorg testified that paragraph seven of the draft affidavit he was asked to sign was untrue. The paragraph stated:

> "It was my understanding that the settlement referenced in paragraph 5 above represented a settlement of any and all claims or liens that could have been asserted by [the Department] against any of the proceeds from the settlement of the Law Division Case or against the Estate of Charlise Smith."

¶ 25    Gorg also testified that paragraph nine, worded similarly to paragraph seven, was untrue. He explained "[b]ecause you settle a PI claim and it's for a PI only. It's for no other—no other liens will be extinguished with the settlement of a PI claim." He reiterated "if you settle a PI claim, it's for PI only and exclusively. It's not for any other liens that may be attached to this client."

¶ 26    After closing arguments, the circuit court gave its ruling orally on the record. Later, the court memorialized its ruling in a written order, stating that it found for the Department "for reasons stated on the record."

¶ 27    After explaining the difference between liens and claims, the court stated that according to the documentary evidence—particularly the e-mails between Indomenico and Gorg—it was clear that the Department and the Estate settled only the lien, not any claims. Although the Estate insisted the settlement encompassed all of the Department's claims or potential claims, Gorg disputed that statement. He testified that he never settled in lump sum a lien plus probate claims with Indomenico and refused to sign the affidavit Indomenico presented to him because the statements about the settlement encompassing all liens and claims were untrue.

¶ 28    The circuit court noted that this presented a credibility issue, which required it to consider demeanor, any motive to lie, any bias against any party, any prior inconsistent statements the witness made, and the reasonableness of the testimony. Applying those factors to Gorg, the court found him credible. His demeanor was appropriate and there was no indication of bias or motive to fabricate. His testimony was reasonable, made sense, was plausible, and was consistent with the documentary evidence supporting it.

¶ 29    Although the court further stated that Indomenico's demeanor was appropriate and the court did not doubt his veracity, despite his role as the attorney answerable to the Estate's heirs, the court found that Indomenico's testimony was not reasonable or plausible. First, explained the court, the lien and claims in this case totaled over $1.1 million "and it does not make sense to this court that Mr. Gorg would settle $1.1 million in claims and liens for $20,000," because that was "less than one fiftieth of the ask and less than two pennies on the dollar." Such a settlement would

constitute "extreme dereliction of duty" on the part of the Department towards "the citizens of Illinois" and the court did not believe that happened. Nothing in the record supported Indomenico's belief that the $20,000 lien settlement encompassed all possible claims against the Estate, including the list of past liens he settled that was provided to the court, which gave no details about those settlements and thus lacked any probative value.

¶ 30      Further, the court explained that the law undercut the reasonableness of Indomenico's testimony. Section 5-13 of the Illinois Public Aid Code (Code) (305 ILCS 5/5-13 (West 2024)), provides that the Department may pursue claims against the estates of recipients of financial aid but, as the court explained, "claims cannot be paid out of settlement proceeds, claims are paid out of the estate." The court stated that "if there are survival proceeds in a settlement, that money has to pass through the estate first before the claims can be paid." The court added: "If we start paying claims out of settlement proceeds or survival proceeds in a settlement, what we're risking is one claim jumping in the front of the line over the other claims that are pending against the estate."

¶ 31      Continuing its explanation of the interplay among the statutes, the court noted that article 18 of the Probate Act (755 ILCS 5/18-1 *et seq.* (West 2024)), has a strict classification for claims, and if there is not enough money "within a particular class" then the claims are paid on a pro rata basis. Thus, the court ruled that the law did not support Indomenico's understanding of his dealings with Gorg. "I didn't believe Mr. Indomenico's testimony that he and Gorg settled the lien and claims here for $20,000 based on prior dealings. I believe Mr. Gorg's testimony that their settlement was" only for the lien. The court explained that it did not believe that Indomenico lied but, rather, found that his belief that he and Gorg had settled liens and claims was incorrect. The court stated that Indomenico and the Estate's representative "lacked a nuance[d appreciation] of

the differences between" estates and settlements, liens and claims, along with wrongful death and survival actions.

¶ 32    Having created a timeline in its notes, the court reviewed it aloud, noting that Indomenico and Gorg settled the lien in early August 2020. In early September 2020, the Estate filed a petition to waive bond on the settlement proceeds, but paragraph three of that document contained two misstatements. The first misstatement was that the Estate contained no assets, which was untrue because there were survival proceeds coming into the Estate as a result of the law division's order settling the cause of action. Similarly, the statement that no claims had been filed against the Estate was untrue because publication had not been made at that time, "so we don't know whether or not there's going to be any claims filed against this estate." Given that publication was not made, the court had denied the petition to waive bond.

¶ 33    The court stated that the handwriting on the October 27, 2020, "amended order for leave to settle cause of action-wrongful death" was the court's own handwriting, placed there to correct multiple errors. For example, the proposed order stated that there were charges against the Estate for fees, costs and liens, which was incorrect. Those were not charged against the Estate; they were charges against the settlement. The proposed order did not account for the survival money, so the court wrote "50% of the net survival" was "payable to Quenita Smith as Indep. Admin. of the Estate as survival proceeds." The court explained that those monies were payable to the administrator, Quenita, as an asset of the Estate to pay claims and expenses, after which anything remaining would be distributed to the heirs. "It's important that the money be in the correct location at the correct time to comply with the Probate Act and to pay the claims." Those errors on the proposed order indicated to the court that there was confusion on the Estate's part about

what a settlement, an estate, survival, and wrongful death were, along with a "loosey-goosey" attitude" about where the money was going and who was going to receive it.

¶ 34    Finally, the court found that the timeline also showed that the Estate settled the lawsuit against Daleco before publishing for claims. Although there was nothing improper about that, it risked "what happened here, settling the lawsuit without knowing what your claim exposure is." Although Indomenico was surprised, he "didn't need to be" because if he had published shortly after opening the estate, he would have known of the claims. In short, the Department did "nothing wrong." The court found that the Department had proved the claims and so they were allowed.

¶ 35    The Estate appealed.

¶ 36                                II. ANALYSIS

¶ 37                        A. Relevant Statutory Provisions

¶ 38    Under the Code, the Department had two nonexclusive options to seek recovery for the medical assistance provided to decedent: the Department could file a claim in the decedent's estate for all of the medical expenses the Department had paid on her behalf, pursuant to section 5-13 of the Code (305 ILCS 5/5-13 (West 2024)), and the Department could assert a lien for the medical assistance provided to decedent for the medical expenses specifically attributable to her tortious injury, pursuant to sections 11-22 and 11-22b of the Code (*id*. §§ 11-22, 22b). Accordingly, the Department filed and settled its lien against the Estate's personal injury cause of action under section 11-22 of the Code and thereafter filed claims against the Estate under section 5-13 of the Code.

¶ 39    Specifically, after decedent's 2019 injury and pursuant to section 11-22 of the Code, the Department placed a lien on any potential verdict, judgment, or recovery from the personal injury

claim, but noted that the lien's amount had not yet been determined. See *Evanston Hospital v. Hauck*, 1 F.3d 540, 543 (7th Cir. 1993) (pursuant to both federal and Illinois law, once Medicaid has paid for medical services, the Department "is obliged to vigorously pursue any third party who might bear some legal responsibility for footing the bill"). Subsequently, as the medical bills related to the injury were presented and paid, the Department tallied them and ultimately sought recovery of $37,914.88. The offer of settlement explicitly stated that the "Department has a lien for $37,914.88, and the Department is willing to accept $20,000, in settlement for the injuries related to the accident of May 4, 2019." Moreover, as expressly provided, in the case of a lien against a recipient's cause of action, the Department has the authority to compromise or settle any claim for benefits. See 305 ILCS 5/11-22b(b)(2) (West 2024). Thus, the Department reduced its lien on the cause of action to $20,000, settling it for 52% of the original amount.

¶ 40 Section 5-13 of the Code, by contrast, is directed at the instance in which a Medicaid recipient has died leaving an estate. See *id*. § 5-13. Here, it is undisputed that the Department expended on decedent a total of $1,066,067.22 in medical benefits over her lifetime that were unrelated to her tortious injury. The claims the Department asserted against the Estate were created by statutory mandate. Medicaid's medical benefits program is part of a federal-state partnership, and federal law requires the states to pursue recovery of medical benefits from recipients' estates. See 42 U.S.C. § 1396(b)(B) ("the State shall seek adjustment or recovery of any medical assistance correctly paid *** from the individual's estate"). In conformity with federal law, the General Assembly enacted section 5-13, which provides:

"Claim against the estate of recipients. To the extent permitted under the federal Social Security Act, the amount expended under this Article for a person aged 55 or more, shall

be a claim against the person's estate or a claim against the estate of the person's spouse, regardless of the order of death, but no recovery may be had thereon until after the death of the surviving spouse, if any, and then only at such time when there is no surviving child who is under age 21, or blind, or is a child with a permanent total disability." 305 ILCS 5/5-13 (West 2024).

Section 5-13 thus declares that amounts paid by the Department "shall be a claim."

¶ 41    The administrator of an estate is a fiduciary to all who have an interest in the estate, including creditors, heirs, legatees, and devisees. *In re Estate of Wallen*, 262 Ill. App. 3d 61, 72 (1994). Thus, this Estate and its administrator owed a duty to potential creditors and claimants to publish notice of decedent's demise and the opening of her estate. See 755 ILCS 5/18-3 (West 2024). Section 18-3 of the Probate Act requires the notice to contain the name and address of the estate's representative and of her attorney of record, and the date by which claims must be filed. *Id.* As the circuit court observed, if the Estate and its administrator had published or given the Department proper written notice as a known creditor when the Estate was opened, the Estate would have known of any claims within six months and would not have been surprised by the Department's timely filed claims.

¶ 42                              B. Settlement

¶ 43    First, we address the Estate's argument that sections 11-22 and 5-13 of the Code prevent the Department from asserting multiple claims against the same settlement proceeds. We review *de novo* the Estate's argument that the Code provisions prevent the Department's recovery. See *Carter v. SSC Odin Operating Co., LLC*, 237 Ill. 2d 30, 39 (2010) (statutory interpretation is reviewed *de novo*).

¶ 44    The Estate's argument lacks merit. Under the statutory framework, the source of funds in a Medicaid recipient's estate is neither relevant nor a defense to a probate claim. See *In re Estate of Ries*, 2021 IL App (2d) 191027, ¶ 34 ("absent a clear settlement or a global release" the source of funds in estate is irrelevant). Thus, if money has passed into a decedent's estate after a personal injury settlement, it is to be used to pay the decedent's debts that were unrelated to her injury, including any claim by the Department under section 5-13. *Id*. ¶ 41. Anything left after the debts are paid is to be distributed to the heirs. 755 ILCS 5/2-1 (West 2024). For this reason, the Estate's contention that its heirs had a property interest in the expectancy of an inheritance is misplaced because that expectancy cannot arise until the Estate's debts are paid.

¶ 45    Acknowledging that this court's decision in *Ries*, 2021 IL App (2d) 191027, precludes the Estate's argument that the Code prevented the Department's claims, the Estate asserts that the facts in this case are different from those in *Ries*, and, alternatively, that *Ries* was wrongly decided. The Estate's assertions lack merit.

¶ 46    In *Ries*, the Department negotiated a personal injury lien against the estate's cause of action for an injury to Lois Ries, the decedent, and accepted a reduced amount in satisfaction of that lien. *Id*. ¶ 9. The Department subsequently asserted a claim against Lois's estate for medical expenses paid over her lifetime that were unrelated to her tortious injury. *Id*. The *Ries* estate argued, as the Estate does here, that the lien settlement precluded the Department from pursuing its claim because the Code did not authorize the Department to "recover twice from the same settlement pool of money." *Id*. ¶ 10. This court, however, held that the statutory scheme obligated the Department to pursue both the lien under section 11-22 and the claim under section 5-13. *Id*. ¶ 39.

¶ 47 The Estate contends that *Ries* is factually different from this case because, here, the Department "attempted to hide the amount that it claimed to have been owed," whereas in *Ries* the Department advised the estate's attorney of the "full extent" of its claim "at the same time." But this factual distinction has no bearing on the holding in *Ries*. The Department advised the *Ries* estate of the full amount it had expended on Lois's medical care in response to the *Ries* administrators' publication of notice to potential claimants and creditors that she had died, that an estate was opened, and whom to contact, as required by section 18-3 of the Probate Act. Here, by contrast, the Estate failed to publish notice for over a year after decedent's estate was opened. To the extent there is a fact that distinguishes this case from *Ries*, it is this Estate's failure to carry out its statutory duty.

¶ 48 In the alternative, the Estate argues that *Ries* was wrongly decided because the *Ries* court should have followed the logic of *In re Estate of Castro*, 289 Ill. App. 3d 1071 (1997), which the Estate believes is controlling authority. It is not. In *Castro*, the decedent was injured by the nursing home in which she resided and her estate received funds from a settlement that her attorneys negotiated with the nursing home. *Id.* at 1073. The trial court disallowed the Department's claim because, pursuant to section 3-605 of the Nursing Home Care Act (210 ILCS 45/3-605 (West 1994)), the settlement funds were explicitly exempt from the recoupment provisions of the Code. *Castro*, 289 Ill. App. 3d at 1074, 1078. This court affirmed that ruling but remanded the case to allow the Department to potentially file a claim against other assets that might remain in the estate. *Id.* at 1076.

¶ 49 *Castro* had no application to the issues in *Ries*, because decedent Lois Ries was not injured by or in a nursing home and, thus, the issues in *Ries* were not controlled by any exemption in the

Nursing Home Care Act. Likewise, the settlement proceeds here were not derived from a settlement involving the Nursing Home Care Act, so we need not consider *Castro*, either.

¶ 50    The Estate merely repeats the statutory construction arguments this court already rejected in *Ries*. We find no reason to depart from the analysis and holding in *Ries*. Accordingly, we reject the Estate's proffered interpretation of the Code. We conclude that, if money has passed into a decedent's estate after a personal injury settlement, that money is to be used to pay any claim by the Department under section 5-13 of the Code that was unrelated to the decedent's injury.

¶ 51    Next, we address the Estate's argument that the circuit court erred in allowing the Department's claims because those claims had previously been settled pursuant to the clear, unequivocal, and valid settlement agreement negotiated between Indomenico and Gorg. According to the Estate, this settlement encompassed any and all claims or liens that could be asserted against either the proceeds of the settlement of the underlying tort action or against the Estate. The Estate's argument challenges factual questions that were resolved by the circuit court. In a bench trial, it is the function of the trial judge to weigh the evidence and make findings of fact. *Kalata v. Anheuser-Busch Co., Inc.*, 144 Ill. 2d 425, 433 (1991). It is the province of the finder of fact to resolve conflicts in the evidence, pass upon the credibility of witnesses, and decide the weight to be given to their testimony. *Tamraz v. Tamraz*, 2016 IL App (1st) 151854, ¶ 19. Reviewing courts will defer to a circuit court's factual findings unless they are against the manifest weight of the evidence. *Kalata*, 144 Ill. 2d at 433. A judgment is against the manifest weight of the evidence only where the opposite conclusion is clearly evident or where the factual findings upon which it is based are unreasonable, arbitrary, or not derived from the evidence. *IMC Global v. Continental Insurance Co.*, 378 Ill. App. 3d 797, 804 (2007). Thus, to reverse, the reviewing court must determine, after

examining the evidence in the light most favorable to the factfinder, "that no rational trier of fact could have reached" the same conclusion. *Tegeler v. Industrial Comm'n*, 173 Ill. 2d 498, 514-15 (1996).

¶ 52    We conclude that the evidence supports the circuit court's finding that the lien against the Estate's cause of action was the only matter that the Estate and Department agreed to settle. Gorg and Indomenico negotiated the Department's lien down to $20,000 and agreed to settle the matter approximately a year after Indomenico opened the Estate. At that point, when the Estate petitioned the circuit court to settle the cause of action and distribute the remaining funds to the heirs, the circuit court learned that the Estate had not published notice of decedent's death in accordance with the Probate Act to notify creditors and claimants. The court directed that the Estate inform it if any claimants or creditors responded to the published notice and, within the six-month period, the Department's bureau of collections filed its claims against the Estate.

¶ 53    We reject the Estate's argument that the Department concealed that it also had probate claims against the Estate and the Department should not be allowed to profit from its "underhanded conduct" in negotiating the lien. The Department properly filed its claims as part of its duty to safeguard taxpayer funds, and the evidence showed that the Department concealed nothing. The circuit court found Gorg's testimony credible, particularly regarding the scope of the negotiations and settlement. Gorg was unaware that the Department had any probate claims to assert against the Estate and he reasonably assumed that an attorney with Indomenico's decades of experience would know that settling a personal injury lien does not extinguish any other claim on an estate. See *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 95 (1992)

(absent a showing to the contrary, public officials are entitled to the presumption that all their official acts have been regular, and that such officials are people of "conscience" and "discipline").

¶ 54    The circuit court did not believe Indomenico's testimony that he and Gorg settled the lien and claims in this case for $20,000, despite Indomenico's characterization of their prior dealings. Instead, the court found that nothing in the record supported the Estate's argument that Gorg and Indomenico had a "meeting of the minds" that the scope of the settlement included any and all liens or claims the Department could have asserted. These findings as to the credibility and weight of the evidence were for the circuit court, as factfinder, to make. See, *e.g.*, *People v. Mosley*, 2023 IL App (1st) 200309, ¶ 17.

¶ 55    The circuit court's finding that Gorg settled only the Department's lien is supported by the record. Gorg contradicted Indomenico's testimony when Gorg testified that he refused to sign the affidavit Indomenico and Hess sent to him because it contained statements that were untrue, such as the statement that the settlement of the lien "represented a settlement of any and all claims or liens that could have been asserted by [the Department] against any of the proceeds from the settlement of the Law Division Case or against the Estate of Charlise Smith." Gorg testified that when he settled a personal injury lien, that was the only matter that he settled. He stated that probate was not his area of expertise. He added that he believed that it was always "understood" that when he settled a personal injury lien with Indomenico it was only for the lien. Gorg testified that he had never reached a settlement with Indomenico that included both personal injury liens and probate claims. The circuit court credited Gorg's testimony, which was the court's prerogative as the factfinder. See *Village of Lincolnshire v. Olvera*, 2024 IL App (2d) 230255, ¶ 73.

¶ 56    Moreover, the correspondence between the two men was unambiguous. In the Department's notice of lien, Gorg introduced himself as a recovery consultant of the personal injury unit, stating that the Department had a lien "[p]ursuant to the provisions of 305 ILCS 5/11-22 and 11-22b of the Illinois Public Aid Code." The letter from Gorg dated August 3, 2020, mentions only a personal injury lien settlement between the Department and the Estate regarding "the injuries related to the accident of May 4, 2019." Gorg also stated in the letter that if the attorney or the Estate had a different understanding, they should contact him.

¶ 57    Indomenico's first letter accompanying the unsigned check stated that payment was in "full and final satisfaction of your Public Aid lien in the above-captioned matter." The wording Indomenico used in his own letter should have alerted him that the only matter being settled was the personal injury lien. Further, the action captioned in that letter was the court case *Smith v. Daleco*, No. 19 L 10334, along with decedent's public aid identification number. Nothing in Indomenico's correspondence hinted that the settlement referenced in that letter involved anything other than the lien against cause of action No. 19 L 10334.

¶ 58    Nor did Indomenico's second letter, which stated that the accompanying check was included "in the amount of $20,000 as reimbursement for a personal injury case with a date of injury of May 4, 2019 for a lien covering public assistance from the dates of 5/4/2019 until 6/13/2019," indicate that Indomenico desired any clarification of what the settlement encompassed. Moreover, the substitute wording in the second letter was even more specific than that of the first. As the circuit court found, the correspondence and e-mails between Gorg and Indomenico "clearly demonstrated" that they settled only the lien, not the probate claims.

¶ 59    Nevertheless, the Estate contends the Department failed to notify either Indomenico or the Estate that the Department "intended to make further claims against the settlement proceeds." This contention attempts to place the onus on the Department when, in fact, the Estate administrator failed to notify creditors pursuant to section 18-3 of the Probate Act that she had opened an estate in decedent's name.

¶ 60    Additionally, the Estate argues that the Department's claims should have been barred by the circuit court's "own October 27, 2020, Order" in which the court approved the settlement. The Estate reasons that the order listed charges against the settlement and asserts that, because no other charges were listed, the Department may not assert a claim against "those same settlement proceeds." The Estate, however, neither supplies authority nor any legal argument to support this novel claim, and so forfeited it on appeal. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020); *Brown v. Tenney*, 125 Ill. 2d 348, 362-63 (1988). Indeed, the circuit court recognized that its order concerning the distribution of the settlement proceeds did not preclude any subsequent claims against the estate. After all, the Estate's belated public notices gave creditors another five months (until March 28, 2021) to file any such claims.

¶ 61    Accordingly, the circuit court's finding that the Department settled only a lien under sections 11-22 and 11-22B of the Code and not the Department's claims against the Estate under section 5-13 of the Code was not against the manifest weight of the evidence.

¶ 62                                        C. Equitable Estoppel

¶ 63    The Estate argues the circuit court, to prevent fraud and injustice, should have applied equitable estoppel to preclude the Department from pursuing its claims. Specifically, the Estate argues that the Department concealed the true scope of its claims against the settlement proceeds,

hid the amount that the Department claimed it was owed, intended to mislead Indomenico by asking him to reissue the check he failed to sign, and engaged in settlement negotiations in bad faith.

¶ 64    The elements of equitable estoppel that a party must establish are (1) the other person misrepresented or concealed material facts, (2) the other person knew at the time he or she made the representations that they were untrue, (3) the party claiming estoppel did not know that the representations were untrue when they were made and when they were acted upon, (4) the other person intended or reasonably expected that the party claiming estoppel would act upon the representations, (5) the party claiming estoppel reasonably relied upon the representations in good faith to his or her detriment, and (6) the party claiming estoppel would be prejudiced by his or her reliance on the representations if the other person is permitted to deny "the truth thereof." *Geddes v. Mill Creek Country Club, Inc.*, 196 Ill. 2d 302, 313-14 (2001). The party claiming estoppel has the burden of proving it by clear and unequivocal evidence. *Id*. at 314.

¶ 65    Illinois courts have recognized that "there is a strong public policy disfavoring the imposition of equitable estoppel against the state." *Deford-Goff v. Department of Public Aid*, 281 Ill. App. 3d 888, 893 (1996). When the doctrine is invoked against the State, "it will be applied only to prevent fraud and injustice." *Id*. Fraud and injustice exist "only when some positive acts by State officials" have induced the proponent to take action she would not otherwise have taken under circumstances where it would be inequitable to hold her responsible for the act "so induced." *SMRJ, Inc. v. Russell*, 378 Ill. App. 3d 563, 576 (2007). Courts apply the doctrine "only in compelling or extraordinary circumstances" (*id*. (collecting cases)), especially where public revenues are involved (*id*.). The State is not estopped by the mistakes or misinformation that State

employees may have given. *Id.*; see *Brown's Furniture v. Wagner*, 171 Ill. 2d 410, 432 (1996). Rather, the conduct at issue must be an "affirmative" act of the "public body itself, such as a legislative enactment, rather than the unauthorized act of a ministerial officer." *Preuter v. State Officers Electoral Board*, 334 Ill. App. 3d 979, 990-91 (2002).

¶ 66    Here, there was no fraud or injustice. To the contrary, the circuit court credited Gorg's testimony and found that the Department "did nothing wrong." It is undisputed that decedent received over one million dollars' worth of Medicaid assistance from the Department, and the reason that her Estate did not learn of the Department's probate claims sooner was because the Estate failed to publish notice or to give the Department proper written notice as a known creditor. Furthermore, Gorg did not misrepresent or conceal any information; he specifically represented to Indomenico that the settlement was for the personal injury lien against the Estate's cause of action. Gorg was unaware of the existence of any probate claims, and had never negotiated a probate claim with Indomenico. The circuit court credited Gorg's testimony, while finding Indomenico's testimony as to his understanding of the settlement encompassing all claims as well as liens to be "implausible" and unreasonable. Lacking any misrepresentation on the part of Gorg or the Department, the Estate has failed to provide any evidence, let alone clear and unequivocal evidence, necessary to support a claim for estoppel.

¶ 67    To the extent the Estate contends that estoppel arose here through Gorg's silence on whether the Department planned to assert probate claims, rather than through any misstatement he made, that assertion is also unavailing. Estoppel by silence can "only occur where one party is aware of the facts and the other party is ignorant. It does not operate where the means of knowledge are equally open to both parties." *Boyer v. Buol Properties, LLC*, 2014 IL App (1st) 132780, ¶ 72.

"In other words, a party claiming the benefit of an estoppel cannot shut his eyes to obvious facts, or neglect to seek information that is easily accessible, and then charge his ignorance to others." (Internal quotation mark omitted.) *Id*. Here, Gorg was unaware that Indomenico—despite decades of negotiating personal injury liens—did not understand the scope of the negotiations, nor was Gorg aware that any other bureau in the Department had a claim against the Estate. The Estate failed to offer proof of any alleged misstatement on the part of Gorg or anyone else in the Department. Furthermore, the Estate administrator neglected to publish the required notice of decedent's death for a year after opening the estate, by which time the lien was resolved. If the administrator had made timely publication or delivered written notice as required under section 18-3 of the Probate Act (755 ILCS 5/18-3 (West 2024)), she and Indomenico would have known within six months that the Department would seek reimbursement for the balance of decedent's care unrelated to her injury. The information Indomenico claimed to lack was readily accessible by a simple, necessary statutory mechanism.

¶ 68    The Estate asserts that the Department had "actual notice" of decedent's death because Gorg negotiated the personal injury lien, and thus the probate claims should be barred. That contention is unavailing because knowledge of "the date of death *cannot be equated* with the knowledge of the critical elements under section 18-3 of the [Probate] Act." (Emphasis in original.) *Matter of Estate of Anderson*, 246 Ill. App. 3d 116, 132 (1993). In *Anderson*, an agent of one of the decedent's creditors had actual notice of his date of death and even attended his wake. *Id*. at 117. The appellate court held that the agent's actual knowledge of death did not bar the creditor's claim. *Id*. at 131-32. Instead, the time bar of section 18-3 of the Probate Act "commenced to run not upon notice of death but on notice of death plus the opening of the estate, the date of issuance

of letters, name and address of the representative and his attorney of record, and that claims must be filed within six months of the issuance of the letters." *Id*. at 131. Here, the Estate had not given the Department the information required by section 18-3 of the Probate Act, and the time bar did not begin to run until the Estate complied with that notice provision. See *Anderson*, 246 Ill. App. 3d at 131-32.

¶ 69     Additionally, the Estate, citing the Illinois Constitution and *In re Estate of Jolliff*, 199 Ill. 2d 510, 524 (2002), claims that it suffered a due process violation because the circuit court allowed the Department's claims. The plaintiff in *Jolliff* challenged the constitutionality of a section of the Probate Act regarding posthumous gifts to full-time family caregivers, fully briefing her claims, which the court rejected. *Id*. at 524-27. But here the Estate fails even to specify which statute it challenges, much less to develop any constitutional argument. Accordingly, the Estate's due process argument is forfeited. See *Marzouki v. Najar-Marzouki*, 2014 IL App (1st) 132841, ¶ 12 (failure to develop an argument results in forfeiture).

¶ 70                                III. CONCLUSION

¶ 71     For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 72     Affirmed.